J-S30003-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DALISHA DANIKA SALTER, | |
| Appellant | No. 378 WDA 2017 |

Appeal from the Judgment of Sentence Entered November 30, 2016
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0016990-2014

BEFORE: BENDER, P.J.E., STABILE, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED AUGUST 07, 2018**

Appellant, Dalisha Danika Salter, appeals from the judgment of sentence of an aggregate term of 7½ to 15 years' imprisonment imposed after a jury convicted her of aggravated assault and other related offenses. We affirm.

The trial court summarized the factual background of this case as follows:

> During the late evening of September 12, 2014, [Appellant] brutally assaulted her infant son [(referred to herein as Victim)], who was eleven (11) months old at the time of the assault. After she beat [Victim], [Appellant] put him outside in the dark, in a car seat, on the back porch of her Wilkinsburg home, next to the garbage. [Appellant] then sent text messages to David Bryant, the father of the child at approximately 11:30 p.m., which stated the following:

---

[*] Retired Senior Judge assigned to the Superior Court.

"Beat df out ya son big ass knot bleedn putn him outside u want dat piece of shit take em cuz bet ima kill him bitch!!!!!!" (11:34[ p.m.])

"He will be outside bitch" (11:46[ p.m.])

"On god! Prob die n too idgaf FUCK U AND HIM STG BETTER TAKE EM TO DA." (11:48[ p.m.])

David Bryant was at a friend's house in Wilkinsburg when he received the text messages from [Appellant]. David Bryant previously had dated [Appellant] for a number of years. The two had a tumultuous and volatile relationship, and they were no longer together at the time of the incident. [Appellant's] text messages caused David Bryant to become concerned for his son, so he went to [Appellant's] home and found his injured son outside on the back porch, right where [Appellant] had said that she left him.

When he arrived at the back porch of [Appellant's] home, David Bryant began video recording what he saw on his cell phone. The video captures [Victim], alone and crying outside on the porch, as well as David Bryant's emotional reaction to finding his injured son. David Bryant can be heard sobbing and banging on the door. He eventually kicked down the door of [Appellant's] house after she failed to answer the door. The video captures what happens inside of the apartment, while the audio reveals David Bryant in a distressed and panicked state. As he is crying, he is heard repeatedly saying to [Appellant], "you hit my fucking son!?"[,] "you beat my son like that yo!?[",] "you hit my son like that!?"[, and] "you put your hands on my fucking son!?" In response to David Bryant's questions about beating [Victim], [Appellant] is heard repeatedly stating, "I don't care," "Oh well," "I told you to get him," "Bitch I don't care." David Bryant testified that he was "not thinking straight" and left the house. He called an ambulance, contacted his sister, and spoke with the police on the phone that night. The text messages sent by [Appellant], and the video taken by David Bryant, were provided to the police that night by Tennille Webb, David Bryant's sister.

At approximately 1:00 a.m. on the morning of September 13, 2014, multiple officers from the Wilkinsburg Police Department were dispatched to [Appellant's] residence after receiving a report of "possible child abuse that had occurred" at the home. When the officers entered [Appellant's] apartment, they encountered [Appellant] in the living room, which was located approximately

25 to 50 feet away from the bedroom where [Victim] was now located. The officers noticed that, although [Appellant's] lip was bloody and swollen, she was "very calm" and did not appear to be in any "kind of distress at that time." The officers entered the master bedroom and observed [Victim's lying] on an adult bed, which did not have any safety railings surrounding it. The child was crying and was in obvious distress, and officers "immediately noticed he had bruising about the face [and] head" and that his nose was bleeding. It was apparent to the officers that the child had been assaulted and that he required immediate medical attention. Medical personnel arrived on the scene shortly thereafter, and [Victim] was transported to Children's Hospital. [Appellant] did not show or express any kind of emotion or concern for her child during her interaction with the officers. She did not ask where the child was being transported[,] and she did not ask to accompany her child to the hospital.

When asked how [Victim] had sustained his injuries, [Appellant] told officers that she had been in an altercation with David Bryant earlier that evening. She stated that she was in her bedroom sleeping, with [Victim] asleep at the foot of her bed, when David Bryant broke into her house. [Appellant] further stated that David Bryant "went around the bed" and "pushed a [flatscreen] TV down on top of the bed where" she was lying with the child, which caused the 55-inch television to fall on top of [Victim]. When officers entered the bedroom, they noticed that the television was sitting upright on top of a tall dresser and that the screen had been broken. The dresser was approximately 5 feet tall.

[Appellant] then told police that David Bryant attempted to assault her and broke her cell phone. When [Appellant] tried to reach for another cell phone on the other side of the bed, David Bryant took the phone and "a set of keys, broke some pictures around the apartment, then fled the residence." [Appellant] told the officers that after David Bryant left the apartment, she attempted to get her child dressed, then placed him in the car seat and put him on the back porch while she "attempted to gather some belongings." [Appellant] told the officers that she was unsure of what to do next, so she "sat on the bed for approximately an hour" and did not contact police or seek medical attention for her child, who, according to her, had just had a 55[-]inch television fall on top of him.

[Appellant's] version of events left the officers with "major questions" surrounding the incident, so [Appellant] was asked to

- 3 -

accompany the officers to the police station to answer more questions. In the meantime, the officers also attempted to locate David Bryant to ascertain his version of events. The officers went to his sister's house, where she provided the officers with the text and video evidence from that evening. Upon reviewing that evidence, the officers placed [Appellant] under arrest for assaulting her child. By the time the officers reviewed the text messages and video, approximately an hour and a half had passed since [Victim] had been assaulted.

At the Children's Hospital of Pittsburgh, [Victim] underwent a CT scan of his head and additional x-rays. He was then admitted to the pediatric ICU unit. [Victim] was placed in a neck collar, and he "had to have an abdominal CT because he had evidence of abdominal injury." Dr. Jennifer Wolford, the attending physician in the Division of Child Advocacy at Children's Hospital, was consulted to evaluate [Victim] due to the nature of his injuries. Her primary responsibility is the "evaluation and assessments of child abuse and child maltreatment."

Upon her examination of [Victim], it was clear to Dr. Wolford that he had sustained numerous and serious injuries. Dr. Wolford noted that [Victim] had "significant bruising to both sides of his face," and that he was in the "third percentile for his age[]" [with respect to his weight.] Dr. Wolford also observed that [Victim] had bruising and swelling across his nose, and that he was bleeding underneath his right eye. [Victim] had "bursted blood vessels" in "the inner part of his right eye," which indicated blunt trauma. [Victim] had suffered a "subconjunctival hemorrhage," and he had "skull fractures in the rear sides of his head above his ears on both sides." The bruising and inflammation that he suffered also extended into his hairline and ears. [Victim] suffered "trauma on both sides of his face" and had "multiple bruises" in "multiple planes of his body." Dr. Wolford also was concerned that [Victim] had been the victim of hair pulling because there was obvious thinning of his hair on the right side of his head.

The x-rays conducted revealed that [Victim] had "two rib fractures of different ages." One was a healing rib fracture of his 10th rib on the right side of his body, and the other was a rib fracture of the 5th rib on the right side of his body. Dr. Wolford noted that rib fractures "are highly concerning and usually associated with physical child abuse." The rib fractures were approximately two (2) to three (3) weeks old. Dr. Wolford also determined that [Victim] had suffered significant "abdominal trauma, specifically

[to] the liver." [Victim's] liver enzymes were 20 times the normal limit, which indicated a liver contusion and showed that "he had clearly taken blunt trauma to the abdomen." Dr. Wolford explained that, in order to sustain a liver contusion, "[g]reat force" had to be inflicted on the liver. She further explained that air bags being deployed as a result of a car accident would not even cause that type of injury.

Based on her examination of [Victim], and based on her training, education, and experience, Dr. Wolford concluded that [Victim's] injuries were inconsistent with him receiving "one strike or one blow of some kind" because he had "multiple impacts across his head" that caused substantial bruising. Based on the nature and location of his injuries, it was her opinion that [Victim] had "clearly been the victim of inflicted trauma." The fact that [Victim] had "multiple hits in multiple planes of the head across both sides" led her to conclude that he was the "victim of child physical abuse." Dr. Wolford rejected the notion that [Victim's] injuries could have been the result of an accident because, although accidental bruising happens to children, "the most common sites of accidental bruises are shins, knees and foreheads." She determined that [Victim's] injuries were "not anywhere near" the type of accidental bruising that occurs in some children. Dr. Wolford explained that [Victim's] injuries were very serious and necessarily would have caused him "[s]ignificant" and "very substantial pain." It was clear that [Victim] had sustained "multiple repeated hits to the face" and that there was "no way that [his injuries were caused] in one shot."

Dr. Wolford's overall diagnosis was that [Victim] "had been the victim of physical child abuse on more than one occasion [] [a]nd likely repeatedly." Dr. Wolford firmly rejected the idea that a television set falling on a child could cause "two parietal skull fractures, one healing rib fracture, one acute rib fracture, bruising and hemorrhaging about the head, tissue damage around the eyes and a liver contusion." Dr. Wolford estimated that [Victim] suffered "at least 20 blows to the head." She confirmed that "there is no way" that [Victim's] injuries were "caused by an accidental single event," and her opinions were rendered to a reasonable degree of medical certainty. Dr. Wolford explained that as a child abuse physician, it is her duty to assess whether injuries are caused accidentally or as a result of abuse. Based on her evaluation of [Victim], Dr. Wolford testified persuasively that "there is absolutely no accidental explanation for the extent of [his] injuries."

> At trial, [Appellant] testified on her own behalf and denied that she was the cause of [Victim's] injuries. She recounted the volatile relationship that she had with David Bryant, as well as the altercation that had transpired between them on the day of the incident. She maintained that the significant injuries suffered by her son were caused by a 55-inch television falling off the dresser when David Bryant broke into her apartment on the night of the incident and assaulted her. [Appellant] also disputed the validity of the video recording taken by David Bryant and denied that the text messages were sent by her.
>
> [Appellant's] friend, Tiesha Griffin, also testified on her behalf. Ms. [Griffin] had previously babysat [Victim], but she had stopped babysitting him in August of 2014. Ms. [Griffin] admitted that she did not have any medical training, and she testified that, during the course of her watching [Victim], she had never noticed any bumps or bruises on his head.

Trial Court Opinion (TCO), 10/4/2017, at 2-10 (internal citations to record omitted; some brackets added).

A jury trial took place between August 2, 2016 and August 4, 2016. Ultimately, a jury found Appellant guilty of aggravated assault - victim less than 13 and defendant 18 or older, 18 Pa.C.S. § 2702(a)(9); endangering welfare of children – parent/guardian/other commits offense, 18 Pa.C.S. § 4304(a)(1); simple assault – victim under 12 and defendant 18 or older, 18 Pa.C.S. § 2701(b)(2); recklessly endangering another person, 18 Pa.C.S. § 2705; and false report to law enforcement authorities – falsely incriminate another, 18 Pa.C.S. § 4906(a). On November 30, 2016, Appellant received an aggregate sentence of 7½ to 15 years' imprisonment. She subsequently filed a timely post-sentence motion, in which she challenged, *inter alia*, whether the verdicts were against the weight of the evidence. On February 2, 2017, the trial court denied Appellant's post-sentence motion. Appellant

filed a timely notice of appeal on March 3, 2017, and timely filed a court-ordered statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant raises a single issue for our review:

> Did the lower court abuse its discretion when it denied the post-sentence motion alleging that the guilty verdicts in this case were against the weight of the evidence provided?

Appellant's Brief at 6.

Initially, we acknowledge our standard of review:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

>> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained:

The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054-55 (Pa. 2013) (internal citations and quotation marks omitted; emphasis in original).

Appellant argues that the trial court abused its discretion in determining that the verdicts were not against the weight of evidence because "the testimony of a known purveyor of falsehood, David Bryant, was believed, despite [his] inconsistencies and lies, over the testimony of [Appellant]." Appellant's Brief at 13 (unnecessary emphasis omitted). Appellant asserts that "[n]o reasonable juror should have believed any testimony given by the father, David Bryant." *Id.* at 15.[1] Appellant suggests that she "was the more

_____

[1] To support her argument that David Bryant is not credible, Appellant explains that he has "pled guilty to burglary and theft, both of which are *crimen falsi* offenses." Appellant's Brief at 21. Further, she claims that his testimony became "vastly different" on the second day of trial after he had received immunity from charges related to this incident. *See id.* at 17. Additionally, Appellant argues that David Bryant "did not know his son's birthday or how old his son was." *Id.* at 21. Appellant also states that David Bryant "abused

believable witness in many respects and her version of the incident should have been accepted." *Id.* at 22.

After reviewing the record and the trial court's opinion, we reject Appellant's weight claim. The trial court explained:

> In challenging the weight of the evidence, [Appellant] seeks to frame this case as one that solely rested on credibility determinations. [Appellant] represents the case as a "classic he said/she said scenario," which is not an accurate statement of fact. While credibility issues were at play, [Appellant] substantially overlooks the fact that the finding of guilty involved more than a simple resolution of whether [Appellant's] testimony was more credible than the testimony of David Bryant. Indeed, this case involved text and video evidence taken at the time of the incident as well as an assessment by a neutral and objective medical witness who vehemently rejected any claim that [Victim's] injuries were caused accidentally, by a television falling off of a dresser.
>
> As noted, Dr. Wolford, a child abuse physician whose primary responsibility is to determine whether injuries are caused as a result of accidents or child abuse, firmly rejected [Appellant's] claim that [Victim's] injuries were caused by way of an innocent and accidental event. Dr. Wolford confidently and convincingly testified that the child had been "the victim of physical child abuse on more than one occasion" and that, in addition to his rib fractures and liver contusion, the child had sustained approximately 20 blows to the head. This objective medical evidence supported David Bryant's testimony and the Commonwealth's overall theory that [Appellant] had brutally assaulted her child and that she had little, if any, regard for his life and well-being.
>
> [Appellant's] challenge to the weight of the evidence, much like her trial strategy, completely ignores the medical evidence and

---

[her] on various occasions, as he was a heavy drinker and extremely jealous, thinking that [Appellant] was dating or talking to other men[,]" and "the police had been called to her apartment several times because Bryant would come to her apartment without permission." *Id.* (citation omitted).

testimony and, instead, shifts the focus and blame to David Bryant, his history, and behavior. While Mr. Bryant certainly had character flaws, there was no attempt to hide from the jury or gloss over the weaknesses surrounding his character and testimony. For example, David Bryant admitted that he had been incarcerated at some point in time, and the jury was informed that he had an active warrant for his arrest at the time of the incident. Mr. Bryant, despite expressing concerns that he might incriminate himself with some of his answers at trial, admitted that there were times that he broke into [Appellant's] house, that his active warrant was for a burglary at [Appellant's] residence, that he had assaulted [Appellant] several times in the past, and that he had broken things at her apartment on the evening that the incident occurred. The jury also was aware that David Bryant was testifying pursuant to an immunity agreement with the Commonwealth, that he had been charged with crimes as a result of the incident, and that he had prior *crimen falsi* convictions for burglary and theft.

While David Bryant was not going to win any father-of-the-year awards, neither he nor his parenting skills were on trial. The only question before the jury was whether [Appellant] was responsible for the injuries suffered by her infant child. The amount of weight to be given to David Bryant's testimony was solely a matter for the jury to decide, and they were free to believe all, part, or none of his testimony. It is clear that when the jury considered his testimony, the medical evidence, and the rest of the evidence as a whole, it found that [Appellant's] version of events was not worthy of belief. As noted, the medical testimony in this case was compelling, with Dr. Wolford sharply rejecting the idea that [Victim's] injuries were caused by the television. She opined, to a reasonable degree of medical certainty, and with unshakeable certainty and conviction, that the child's injuries were produced as a result of repeated abuse and trauma. The competing story to Mr. Bryant's — [Appellant's] claim that [Victim] was injured when a television fell on top of him — was simply not supported by any evidence aside from her own self-serving testimony.

Although it did not sit as the fact-finder in this case, this court presided over the trial, and it had the opportunity to observe the witnesses' demeanor and tone as they testified. This court had no trouble understanding why the jury rejected [Appellant's] testimony in favor of the Commonwealth's evidence. [Appellant] did not show any emotion throughout the trial, even when pictures of [Victim's] injuries were being shown to the jury. When she took

the stand, she was cold, calculated, combative, and completely unconcerned for the well-being of her child. [Appellant's] testimony was not credible in the least, and her testimony did not carry the "ring of truth" that would accompany the testimony of an aggrieved mother who allegedly watched her child sustain serious injuries from a fallen television and who was being wrongly accused of committing a heinous attack on her child.

Not only was [Appellant] lacking the emotion and concern of a mother with a seriously injured child at the time of trial, but the officers who responded to the incident also testified to [Appellant's] emotionless state at the very time of the incident. The officers testified that [Appellant] was "very calm" and did not appear to be in any "kind of distress" when they arrived at her residence on the night of the incident. [Appellant] did not show or otherwise express any kind of concern for her child, and she did not ask to accompany her child to the hospital. Additionally, instead of trying to seek help and medical attention for her child, who, according to her, had just been crushed by a 55-inch television, she sat in her room for over an hour after David Bryant fled from the residence, likely trying to concoct an explanation for [Victim's] injuries, while she left her injured son alone outside, in the middle of the night, next to a pile of trash.

[Appellant] essentially seeks to retry her case on appeal. Indeed, the arguments set forth in support of [Appellant's] weight claim were arguments that have already been presented to the jury for their consideration, and ultimately rejected by them. It is not the function of this court to second-guess the credibility determinations made by the jury or to question the jury's resolution of conflicting testimony. Neither this court, nor the appellate court, may substitute its judgment for that of the fact-finder…. The jury was free to believe all, part, or none of the evidence presented in this case, and it was solely their duty to evaluate the evidence as a whole and determine the amount of weight to be afforded to the testimony of the witnesses.

For the reasons set forth above, this court was not at all shocked by the verdict rendered. There were no facts that were "so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice," and the verdict was not "so contrary to the evidence so as to shock one's conscience." ***Clay***, [64 A.3d] at 1055.

- 11 -

TCO at 12-16 (some internal citations omitted).  We ascertain no abuse of discretion by the trial court in denying Appellant's weight claim.  Accordingly, we conclude that the verdicts were not against the weight of the evidence, and affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/07/2018